UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ADVANCED ION BEAM | ) | |
| TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 09-11448-NG |
| VARIAN SEMICONDUCTOR | ) | |
| EQUIPMENT ASSOCIATES, INC., | ) | |
| NORMAN L. TURNER, KENNETH H. | ) | |
| PURSER, and ALICE W. ENGE and | ) | |
| ELIZABETH DILL, as Co-Executrixes | ) | |
| of the Estate of Harald A. Enge, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION
## ON DEFENDANTS' MOTION TO DISMISS

April 27, 2010

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiff Advanced Ion Beam Technology, Inc. ("AIBT") has brought this action

against the defendants, Varian Semiconductor Equipment Associates, Inc. and the owners

of U.S. Patent No. 7,301,156 (the "'156 Patent") (collectively, "Varian"),[1] claiming that

Varian engaged in anti-competitive conduct, in violation of the Sherman Act, by filing a

baseless patent infringement action (the "infringement action").  More specifically, AIBT

asserts that Varian unlawfully attempted to create or maintain a monopoly in the ion

---

[1]  The individual defendants include Norman L. Turner, Kenneth H. Purser, and Alice W.
Enge and Elizabeth Dill, as Co-Executrixes of the Estate of Harald A. Enge.

implantation equipment market, and block AIBT from entering that market, by attempting to enforce a patent against AIBT that was known by Varian to be invalid and unenforceable because it was procured by fraud on the U.S. Patent and Trademark Office ("PTO").

This matter is presently before the court on "Defendants' Motion to Dismiss Plaintiff's Complaint" (Docket No. 8).  For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the motion be ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that the plaintiff's claim that the defendants misled the PTO in connection with their disclosures concerning U.S. Patent No. 3,541,328 and an article authored by W.K.H. Panofsky, et al. be dismissed for failure to state a claim, as should the plaintiff's claim of conspiracy to monopolize.  Since this is the second time the plaintiff has attempted to state a claim based on these grounds, this court recommends that these claims be dismissed with prejudice.  However, this court further recommends that the motion to dismiss be denied with respect to plaintiff's claim that the defendants committed fraud on the PTO by failing to disclose a publication by Nicholas White, et al., the Ionex Quad Magnet, an offer by Nicholas White to sell certain technology to Varian, and the identity of Nicholas White as allegedly one of the inventors of the '156 Patent.

### Background

Varian initiated the infringement action giving rise to this case on March 25, 2008.  By its complaint in that action, Varian alleged that AIBT had infringed, contributed to, or induced infringement of the '156 Patent entitled "Controlling the Characteristics of

-2-

Implanter Ion-Beams."  AIBT responded by denying liability, asserting various affirmative defenses and filing three counterclaims consisting of claims for invalidity, non-infringement and unenforceability.  On November 25, 2008, after the parties had engaged in initial discovery, Varian, for reasons that are in dispute, unilaterally granted AIBT a covenant not to sue on the '156 Patent, and moved to dismiss both its claims and AIBT's three counterclaims.  Ultimately, the court allowed the parties' joint motion to dismiss, thereby dismissing Varian's claims with prejudice pursuant to its covenant not to sue, and dismissing AIBT's counterclaims with prejudice to the extent that those claims were directed to products that were the subject of Varian's covenant not to sue.

On December 24, 2008, after Varian had granted the covenant not to sue and while the motion to dismiss Varian's claim and AIBT's three counterclaims remained pending, AIBT filed a First Amended Answer and First Amended Counterclaims.  Therein, AIBT reasserted its original counterclaims for invalidity, non-infringement and unenforceability, and added five antitrust counterclaims.  The additional claims included *Walker Process* claims[2] and "sham litigation" claims for monopolization and attempted monopolization, as well as a claim for conspiracy to monopolize.  In support of these claims, AIBT alleged among other things that Varian had engaged in monopolization and

---

[2] "A *Walker Process* claim arises when a patentee baselessly institutes litigation to enforce a patent known to be unenforceable because the patent was procured by fraud."  Novo Nordisk of N. Am., Inc. v. Genentech, Inc., 885 F. Supp. 522, 526 (S.D.N.Y. 1995) (citing Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86, S. Ct. 347, 15 L. Ed. 2d 247 (1965)).

attempted monopolization by seeking, through the infringement action, to enforce a patent that it knew was obtained by fraud on the PTO, and that it knew was invalid or otherwise unenforceable.

Varian moved to dismiss AIBT's amended counterclaims for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and on July 20, 2009, this court issued a Report and Recommendation (the "2009 R&R") in which it recommended that Varian's motion be allowed.  (See Docket No. 72 in C.A. No. 08-10487).  In particular, this court determined that AIBT had failed to allege sufficient facts to establish an antitrust injury and therefore lacked standing to pursue its antitrust counterclaims.  This court also concluded that AIBT had failed to allege fraud with sufficient particularity to support its *Walker Process* and "sham litigation" claims, and that AIBT had failed to allege adequate facts to support its claim for conspiracy to monopolize.  Accordingly, this court recommended that all of AIBT's counterclaims be dismissed.[3]  However, it also concluded that the record did not establish that AIBT would be unable to allege a cause of action.  Therefore, this court further recommended that the dismissal be without prejudice.  The 2009 R&R was adopted by the District Judge to whom this case is assigned on August 4, 2009.

---

[3] Because AIBT's counterclaims for invalidity, non-infringement and non-enforceability had been dismissed by the District Court prior to this court's issuance of its R&R, this court addressed only the remaining five antitrust counterclaims in its decision.

Instead of filing a motion for leave to amend its counterclaims in the infringement action, AIBT chose to pursue its antitrust claims by filing a new action against Varian. Thus, on August 31, 2009, AIBT filed the instant action against Varian. The Complaint expands the factual allegations, but contains the same five antitrust claims that AIBT had asserted against Varian by way of its counterclaims in the infringement action. Accordingly, AIBT continues to contend that Varian engaged in anti-competitive conduct, in violation of federal antitrust law, by "alleging infringement of a patent that they knew was obtained by fraud on the [PTO]." (Compl. (Docket No. 1) ¶ 1). Varian has again filed a motion to dismiss, asserting that AIBT has failed to cure the deficiencies identified by this court with respect to AIBT's antitrust counterclaims in the infringement action, and that the Complaint in this action should be dismissed on the same grounds articulated in the 2009 R&R.

As detailed below, this court finds that the expanded factual allegations cure some, but not all of the deficiencies in AIBT's original counterclaims. Therefore, this court recommends that Varian's motion to dismiss be ALLOWED IN PART and DENIED IN PART.

## II.  STATEMENT OF FACTS

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences. See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999). "Ordinarily, a court may not consider any documents that are outside of the complaint, or

not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff['s] claim; or for documents sufficiently referred to in the complaint.'" Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).[4] Applying these standards to the instant case, the relevant facts are as follows.

## The Ion Implantation Device Market

Varian manufactures and sells ion beam implantation devices, which are used to implant ions into a target, such as semiconductor wafers, and into materials on glass substrates used in Liquid Crystal Display screens. (Compl. (Docket No. 1) ¶¶ 11, 15). AIBT alleges, based on information and belief, that on or about 2003, Varian acquired the technology that is the subject matter of the '156 Patent pursuant to a technology license agreement with the inventors. (Id. ¶ 90). The plaintiff contends, again on information and belief, that "Varian acquired the 156 Patent in an effort to obtain blocking intellectual property rights in order to increase its dominant market share and stifle competition." (Id.).

---

[4] Consistent with the relevant standard, this court has considered the documents attached to AIBT's Complaint, as well as the exhibits attached to the Declaration of Christopher G. Lim ("Def. Ex. __"), which is attached to the defendants' memorandum in support of their motion to dismiss. (Docket No. 9). This court has also considered two letters from Kenneth H. Purser to Harald A. Enge dated October 3, 2002 and February 12, 2003. Those letters are described in the Complaint and were submitted to the court during oral argument.

Varian allegedly has held a dominant position in the ion implantation equipment market since at least 2007, when it controlled 64% of the worldwide market.  (Id. ¶¶ 16, 98).  Moreover, according to AIBT, Varian is one of only three major competitors in the United States, which compete for a billion dollars worth of sales.  (Id. ¶ 16).  Allegedly, one of the other two competitors is in the process of withdrawing from the market, and the remaining competitor has suffered a substantial reduction in market share.  (Id.).  AIBT claims that due to Varian's dominant position in the relevant market, it has been able to raise and maintain prices above competitive levels.  (Id. ¶ 100).

AIBT contends that there are significant barriers to entry into the ion implantation equipment market, such as the need for large capital costs and advanced technical know-how.  (Id. ¶ 97).  Additionally, the plaintiff claims that "[i]on implantation equipment is very complicated to design and build and requires long lead times to obtain customer qualification for use in fabrication facilities.  There are also very few customers, most of whom are tied to their existing suppliers.  This makes it difficult for new competitors to enter the market."  (Id. ¶ 17).  Notwithstanding these hurdles, AIBT has developed a product called iPulsar, which allegedly "offers the purest ion beam at the optimum beam current."  (Id. ¶ 20).  AIBT has offered its product for sale, and is in the process of completing customer qualification.  (Id.).

## The '156 Patent Application

The application that resulted in the '156 Patent was filed on June 16, 2005, and the Patent was issued on November 27, 2007.  (Id. ¶¶ 22, 28).  The named inventors include defendants Kenneth H. Purser ("Purser"), Harald A. Enge ("Enge") and Norman L. Turner ("Turner") (collectively, the "defendant inventors").  (Compl. Ex. A at p.1).  The '156 Patent issued from a continuation of U.S. Patent Application No. 11/154,085 (the "'085 Continuation Patent Application"), which claimed the benefit of U.S. Patent Application No. 10/619,702 (the "'702 Patent Application") filed on July 15, 2003.  (Compl. ¶¶ 23, 25).  The '702 Patent Application in turn claimed the benefit of U.S. Patent Application No. 60/396,322 (the "'322 Provisional Application"), which was filed on July 17, 2002.  (Id. ¶¶ 23, 24).

The PTO allowed the claims in the '156 Patent because the Patent Examiner could not find a number of features of the claimed invention in the prior art.  (Id. ¶ 31; Compl. Ex. B at 2-5).  Those features included but were not limited to "an upper magnetic core member," "a lower magnetic core member spaced apart from said upper core member," and "a plurality of focusing coil units distributed along" the core members.  (Id.).  AIBT claims that features of this "dual bar system" described in the '156 Patent were disclosed in the prior art, but that the Examiner was unable to find them due to the defendants' intentional misrepresentations and omissions.  (See Compl. ¶¶ 32-33).  In particular, AIBT alleges, based on information and belief, that

since at least 2002 the Defendant inventors were aware of material
prior art affecting the patentability of the claims applied for.  The
Defendant inventors included false and misleading statements
regarding known invalidating prior art in their 322 Provisional
Application, filed on July 17, 2002.  The Defendant inventors
repeated these same false and misleading statements in their 702
Patent Application, filed on July 15, 2003, as well as in their
continuation application filed on June 16, 2005.  Moreover, during
the prosecution of the 702 Patent Application and the 085
Continuation Application which resulted in the 156 Patent, the
Defendant inventors intentionally decided not to disclose their
knowledge that certain inventions, including the dual bar
configuration being claimed in the 085 Continuation Application,
were not patentable in light of known prior art.

(Compl. ¶ 29).  As detailed below, the plaintiff contends that the alleged misstatements

and omissions concerned U.S. Patent No. 3,541,328 (the "'328 Patent") that had been

issued to Enge in 1970, as well as publications by Nicholas White, et al. and W.K.H.

Panofsky, et al., a lens for ion beam control commonly known as the "Quad Magnet," an

offer by Nicholas White to sell certain technology to Varian, and the identity of the

inventors of the '156 Patent.

## Alleged Misrepresentations Concerning the '328 Patent

The record shows that each of the applications submitted to the PTO contained

references to the '328 Patent, and that the Patent Examiner considered the '328 Patent in

connection with the issuance of the '156 Patent.  (See Compl. Exs. E at 5 and G at 5; Def.

Exs. 1-3).  Nevertheless, AIBT alleges that the defendant inventors misled the PTO

regarding the significance and scope of the '328 Patent.

AIBT claims, based on information and belief, that the inventors knew the '328 Patent anticipated one or more of the pending claims of the '156 Patent, but submitted Inventor Declarations to the PTO in which they attested that they were the true inventors of the subject matter claimed in the '156 Patent.  (Compl. ¶ 34).  AIBT's belief is based upon two letters that Purser sent to Enge years before the issuance of the '156 Patent. (Id. ¶¶ 36-37).  The first letter, which is dated October 3, 2002, provides in relevant part as follows:

> I have been talking to Varian about the possibility of acquiring the patents that we have worked on during the last year ....
>
> One of the things that they are concerned about is whether there may be patent problems.  Some time ago Vandepot or Berrian went to Varian wanting to sell intellectual property, which included some type of focusing element probably that I sense was centered around your dual bar-type quadrupole system, described in your 1970 patent 3,541,328.
>
> Although our patent application, which has been filed as a provisional in the form that is attached, is based upon the Panofsky frame structure, the feature that distinguishes our system from Panofsky's is the inclusion of a multiplicity of independent windings that can be [sic] independently excite a variety of correcting fields.  (see claims 1, 9 and 10).
>
> ... When I reviewed your 1970 patent 3,541,328 it clearly refers to a plurality of coil units (claim 5) and a plurality of power supplies.  So that for us to claim this feature, as applied to a dual bar structure, as a feature of our most recent invention, is not possible ....

(Ltr. from Purser to Enge dated 10/03/02; see also Compl. ¶ 36).  The second letter, dated February 12, 2003, reads in relevant part:

> A review of a patent by you ... has turned up the distressing fact that while figure 6 within the patent shows individual multipole windings wound across the whole length of the corrector each of which is driven by an individual dedicated power supply, claim 4 clearly states that the currents through each of the individual primary coil modules is independently controllable.
>
> While I guess that this feature was never incorporated into an actual manufactured spectrograph, finding this claim at this late hour is unfortunate for our negotiations.  The words, written so long ago, eliminate a major unique feature of the patent we have filed and are presently negotiating with Varian to purchase.

(Ltr. from Purser to Enge dated 2/12/03; <u>see</u> <u>also</u> Compl. ¶ 37).

AIBT alleges that the inventors intentionally misled the PTO by failing to disclose their understanding, as revealed by the letters, that one or more of the claims of the '156 Patent were anticipated by the '328 Patent.  (Compl. ¶ 43).  Additionally, the plaintiff claims that the inventors intentionally deceived the PTO when they executed the Inventor Declarations attesting to their status as the true and only inventors of the inventions claimed in the '156 Patent.  (<u>Id.</u> ¶ 38).  According to AIBT, the PTO reasonably relied on the false and misleading statements and Declarations, and would not have issued the '156 Patent with coverage that included the dual bar system described therein if the inventors had not misled it about the '328 Patent.  (<u>Id.</u> ¶¶ 41-42, 44).

In addition to its claims that the inventors misled the PTO concerning their belief that claims of the '156 Patent were anticipated by the '328 Patent, AIBT alleges that the inventors deliberately misrepresented the scope of the '328 Patent to the PTO.  In particular, AIBT alleges that during the prosecution of the '156 Patent, questions were

raised as to whether the prior art included "apparatus[es] used for ion implanting comprising: a structure of magnetic material with an upper core and a lower core having long dimensions between their ends and with parallel axis" and having "a plurality of independent current excited coil units."  (Id. ¶ 45 (quotations and citation omitted)). According to the plaintiff, the defendants were aware that the '328 Patent describes coils that are independently powered and controllable.  (Id. ¶ 47).  However, because of the defendants' alleged misrepresentations, the PTO Examiner was unable to find this feature in the prior art.  (Id. ¶ 49).

AIBT contends that the defendant inventors carried out their deception by altering their description of the '328 Patent in the '085 Continuation Patent Application.[5]  (Id. ¶ 46).  Originally, in their '322 Provisional Application, the inventors described Figure 6 of the '328 Patent as follows: "Referring to figure 6 of [the '328 Patent] it can be seen that for at least one embodiment the coils for each multipole are connected in series and powered as a single unit."  (Compl., Ex. E at 5).  According to AIBT, the defendants' use of the phrase "for at least one embodiment" illustrates their awareness that the '328 Patent describes two embodiments: one shown in Figure 6, and a second, more relevant embodiment, which is depicted in Figures 4 and 5 and described in Claim 4 of the '328

---

[5]  Although the plaintiff alleges that the defendants misled the PTO by changing their description of the '328 Patent in the "'702 Patent Application," the exhibits attached to the Complaint demonstrate that the defendants changed their description of the '328 Patent in the '085 Continuation Patent Application.  (See Compl. ¶¶ 46-47; Compl. Exs. E at 5 and G at 5). This court has construed AIBT's allegations in accordance with the exhibits.

Patent as an apparatus "'wherein said variable magnetic means is arranged so that the current in each of said plurality of electromagnet means is <u>independently controllable</u>.'" (Compl. ¶ 46 (emphasis in original)).  However, in their '085 Continuation Patent Application, the defendant inventors altered their description of the prior art by removing the phrase "for at least one embodiment" and describing Figure 6 of the '328 Patent as follows: "Specifically, in figure 6 of this patent it can be seen the coils for each multipole are connected in series and powered as a single unit."  (Compl., Ex. G at 5).  AIBT contends that by doing so, the inventors misleadingly suggested to the PTO "that the '328 Patent as a whole only describes coils that must be powered as a single unit" and prevented the Patent Examiner from discovering that the prior art disclosed a dual bar system with coils that are independently powered and controllable. (Compl. ¶¶ 47, 49).  It further claims that the PTO "would not have issued the 156 Patent with coverage that included the dual bar system as described in the 156 Patent" if the defendant inventors had not made these alleged misrepresentations.  (<u>Id.</u> ¶ 50).

<b>Alleged Misrepresentations<br><u>Regarding the White and Panofsky Publications</u></b>

AIBT also claims that the defendant inventors made misrepresentations and omissions regarding a 1999 article by Nicholas White, <u>et al.</u> entitled "The Control of Uniformity in Parallel Ribbon Ion Beams up to 24 Inches in Size" (the "White Reference") and an article by L.N. Hand and W.K.H. Panofsky entitled "Magnetic Quadrupole with Rectangular Aperture" (the "Panofsky Reference"), which was

published in 1959.  (Id. ¶¶ 51-61; see also Compl. Exs. H & I).  The record shows that the defendant inventors referred to both the White Reference and the Panofsky Reference in the specification of the '156 Patent, and that the inventors listed the Panofsky Reference on disclosure statements filed with the PTO.  (Id. ¶ 51; Compl. Ex. 1 at Col. 2, ll. 24-27; Def. Exs. 2 & 3).  Nevertheless, the plaintiff contends that the defendant inventors failed to disclose these materials to the PTO as prior art and made material misrepresentations regarding their scope.  (Compl. ¶ 61).

AIBT claims that the White Reference discusses ion implantation devices comprised of "a structure of magnetic material with an upper core and a lower core having long dimensions between their ends and with a parallel axis and having a plurality of independent current excited coil units."  (Id. ¶ 51).  It further claims that despite their knowledge of the White Reference, the defendant inventors misled the PTO about the contents and scope of the article in the '156 Patent specification and otherwise failed to disclose the relevant portions of the Reference to the PTO. (Id. ¶¶ 53-55).  Specifically, AIBT alleges that the full White Reference "was and remains material to the patentability of the 156 Patent" but that "[t]he Defendant inventors intentionally failed to disclose this reference to the PTO as required by 37 C.F.R. § 1.56(a)[6] [R-2] in any Information Disclosure Statement PTO form 1449, including those filed on August 25, 2005 and

---

[6]  37 C.F.R. § 1.56(a) addresses the duty of "[e]ach individual associated with the filing and prosecution of a patent application ... to disclose to the [PTO] all information known to that individual to be material to patentability ...."

November 7, 2006." (Id. ¶¶ 54-55).  It also alleges, based on information and belief, that "the Defendant inventors intentionally failed to provide the PTO with a complete copy of this material reference." (Id.).

The Complaint contains nearly identical allegations concerning the Panofsky Reference.  (See id. ¶¶ 56-60).  Thus, AIBT claims that although the Panofsky Reference disclosed the same types of devices as the White Reference, and was material to the patentability of the '156 Patent, the defendant inventors misrepresented the contents and scope of the Panofsky Reference in their patent specification, and intentionally failed to disclose it to the PTO in connection with the patent application process.  (Id.).  AIBT contends that as a result of the defendant inventors' intentional misrepresentations and omissions regarding the White and Panofsky References, the PTO was unaware that the prior art disclosed a dual bar system with coils that are independently powered and controllable, and the defendant inventors were able "to fraudulently obtain issuance of the 156 Patent."  ( Id. ¶¶ 61, 63).  It also asserts that the PTO "would not have issued the 156 Patent with coverage that included the dual bar system as described in the 156 Patent" if the defendant inventors had not misled it about these publications or if they had provided full copies of the References to the PTO.  (Id. ¶ 64).

**Alleged Omissions Concerning
the Quad Magnet and Offer to Sell Technology**

In addition to the alleged misrepresentations and omissions described above, AIBT claims that the defendants acted fraudulently by failing to disclose material prior art

known as the "Quad Magnet" and by failing to disclose information regarding Nicholas

White's offer to sell Varian certain technology, which AIBT refers to as the "White 2 Bar

Lens."  It asserts that the PTO would not have issued the '156 Patent with coverage that

included the dual bar system described in the Patent if the defendants had provided this

information to the PTO.  (Id. ¶¶ 73, 86).

    According to the plaintiff, the Quad Magnet is a rectangular lens used for ion

beam control, "which allowed the user to steer, deflect, or focus an ion beam, and to shut-

off current to the excitable coils wrapping the short parallel magnetic cores that separated

and joined the long parallel magnetic cores of the lens frame."  (Id. ¶ 65).  AIBT claims

that the Quad Magnet was manufactured and sold by General Ionex Corporation, a

company that AIBT believes was founded and run by defendant Purser.  (Id.).  Purser

allegedly sold a Quad Magnet to Nicholas White ("White") in 1984.  (Id. ¶ 66).

    AIBT contends that the Quad Magnet was and remains material to the patentability

of the '156 Patent because it anticipates or renders obvious the invention disclosed in the

'156 Patent.  (Id. ¶¶ 67-68).  In particular, it alleges that the Quad Magnet discloses

features that are found in the claimed invention, including "an upper magnetic core

member, a lower magnetic core member, and a plurality of focusing coil units distributed

along these core members."  (Id. ¶¶ 71-72 (internal quotations omitted)).  AIBT claims

that despite Purser's and the other inventors' knowledge that the Quad Magnet

constituted material prior art, they intentionally failed to list it on their disclosure

statements filed with the PTO.  (Id. ¶ 69).  According to the plaintiff, the defendant

inventors were able to  obtain issuance of the '156 Patent as a result of this omission.  (Id. ¶ 70).

The White 2 Bar Lens was invented by White and allegedly consists of "an apparatus for focusing, deflecting and aberration-correcting of ion optical components comprising a structure manufactured from only two magnetic cores."  (Id. ¶ 74).  AIBT alleges that in about February 2003, White authored a PowerPoint presentation in which he described the White 2 Bar Lens, and that on March 6, 2003, White delivered the PowerPoint presentation to Varian, thereby disclosing his invention to the defendants. (Id. ¶¶ 76-77).  AIBT further alleges that from February to August 2003, White offered to sell the technology to Varian.  (Id. ¶ 78).  Thus, Varian allegedly became aware of the invention, and White's offer to sell, prior to the July 15, 2003 priority date of the claims of the '156 Patent.  (Id. ¶ 80).

AIBT asserts that White's offer to sell "anticipates or renders obvious the purported invention(s) disclosed in the 156 Patent because it described an invention described in the 156 Patent, and, as such, was and remains highly material to the patentability of the 156 Patent."  (Id. ¶ 81).  In particular, AIBT claims that as in the case of the Quad Magnet, the White 2 Bar Lens discloses "an upper magnetic core member, a lower magnetic core member spaced apart from said upper core member, and a plurality of coil units distributed along these core members."  (Id. ¶ 84 (internal quotations omitted)).  Furthermore, AIBT contends that the defendants intentionally failed to include White's offer to sell his technology on its disclosure statements, as required by 37

-17-

C.F.R. § 1.56(a).  (Id. ¶ 82).  According to the plaintiff, the defendant inventors were able

"to fraudulently obtain issuance of the 156 Patent" as a result of this omission.  (Id. ¶¶

82-83).

## Alleged Misrepresentations Regarding Identity of Inventors

Finally, AIBT claims that the defendant inventors misled the PTO by failing to

identify White as one of the inventors of the subject matter claimed in the '156 Patent.

Specifically, AIBT alleges that the defendants "knew, or should have known, that

Nicholas White contributed to the conception of at least one claim limitation of the 702

Patent Application, the 085 Continuation Patent Application, and the 156 Patent."  (Id.

¶ 88).  It further alleges, based upon information and belief, that the defendant inventors

deliberately and knowingly, and with an intent to deceive the PTO, omitted to list White

as a contributing inventor during prosecution of the '156 Patent, and failed to correct their

omission thereafter.  (Id. ¶ 87).  AIBT contends that as a result, Varian knew that the '156

Patent was unenforceable at the time it filed the infringement action.  (Id. ¶ 89).

## The Infringement Action

As indicated above, Varian initiated its infringement action against AIBT on

March 25, 2008.  (See Docket No. 1 in C.A. No. 08-10487-NG).  AIBT alleges, based on

information and belief, that at the time it filed its lawsuit, Varian was aware that the

defendant inventors had procured the '156 Patent by fraud on the PTO and that the Patent

was invalid.  (Compl. ¶¶ 91-93).  However, Varian allegedly elected to proceed with the

lawsuit in order to block AIBT, a start-up company, from competing in the ion beam

equipment market and to preserve or increase its monopoly position in that market.  (Id. ¶¶ 91, 101).  In fact, according to the plaintiff, Varian filed the infringement action almost immediately after AIBT's only existing customer, Taiwan Semiconductor Manufacturing Company Limited ("TSMC"), agreed to purchase iPulsar equipment from AIBT.  (Id. ¶ 102).  AIBT claims that TSMC is one of the biggest and most important customers in the market for ion beam equipment, and that AIBT competes directly with Varian for TSMC's business.  (Id.).

At issue in this case is whether AIBT has alleged that it suffered antitrust harm as a result of Varian's infringement action.  As detailed above, Varian's claims against AIBT in that action were dismissed with prejudice pursuant to a covenant not to sue. (See Docket No. 62 in C.A. No. 08-10487-NG).  Nevertheless, AIBT alleges that it suffered harm because "the Defendants' baseless suit delayed AIBT's entry into the relevant market."  (Compl. ¶ 103).

Specifically, the plaintiff alleges that as a result of Varian's infringement action, its sole customer, TSMC, required the plaintiff to perform an in-depth analysis of its iPulsar product in order to demonstrate that there were no infringement issues.  (Id. ¶ 104).  AIBT claims that this requirement delayed qualification of its product, and consequently, postponed AIBT's entry into the ion beam equipment market.  (Id. ¶¶ 103-104).  Additionally, AIBT allegedly had to divert personnel from its work integrating the iPulsar into TSMC's system in order to respond to Varian's infringement claims.  (Id.).

-19-

Thus, Varian's infringement action allegedly hindered AIBT's ability to provide TSMC with technical service and assistance.  (Id. ¶ 103).

Although TSMC was AIBT's only existing customer, the plaintiff alleges that Varian's infringement action also caused delay in the potential sale to an entity known as PowerChip Semiconductor Corporation ("PSC").  (Id. ¶ 105).  Specifically, AIBT claims that in 2008, it provided PSC with a demonstration plan of the iPulsar product.  (Id.).  However, due to PSC's concerns about AIBT's possible infringement of the '156 Patent, the demonstration plan was not activated until after the infringement action was dismissed.  (Id.).

AIBT contends that the alleged delays caused by Varian's infringement action

> caused injury to AIBT and the relevant market by: (1) subjecting AIBT to the costs and burdens of defending itself against a patent infringement action based on the fraudulently-procured and invalid 156 Patent, the costs associated with providing its customer an analysis of AIBT's technology, and the costs created by AIBT's delayed entry into the relevant market, (2) creating doubt in the minds of AIBT's sole current customer, (3) causing delay to AIBT's negotiations with its sole current customer and slowing down AIBT's technical service and assistance to its sole current customer and the progress of research and development by depleting AIBT's human resources, (4) hindering AIBT's ability to convince its sole current customer to accept and purchase AIBT's product, thereby damaging AIBT's relationship with its sole current customer, which may ultimately prevent the qualification of AIBT's current product, and therefore, eliminate AIBT's current product from the market-place, (5) potentially preventing the introduction of a superior product with lower sale price into the marketplace, and (6) providing Defendant Varian with the ability to raise and maintain prices above competitive levels.

(Id. ¶ 103).  According to AIBT, it was only after the court dismissed Varian's infringe-
ment claims against it that TSMC began to accept its iPulsar product and PSC resumed its
interest in evaluating AIBT's product.  (Id. ¶ 106).

Additional factual details relevant to this court's analysis are described below.

### III.  ANALYSIS

### A.      Motion to Dismiss Standard of Review

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.
Thus, when confronted with a motion to dismiss, the court accepts as true all well-
pleaded facts and draws all reasonable inferences in favor of the non-moving party.
Cooperman, 171 F.3d at 46.  Dismissal is only appropriate if the pleadings, so viewed,
fail to support "'a plausible entitlement to relief.'"  Rodriguez-Ortiz v. Margo Caribe,
Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,
559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

Two underlying principles must guide the court's assessment as to the adequacy of
the pleadings to support a claim for relief.  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st
Cir. 2009).  "'First, the tenet that a court must accept as true all of the allegations
contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the
elements of a cause of action, supported by mere conclusory statements, do not suffice.'
Such conclusory statements are 'not entitled to the assumption of truth.'"  Id. (quoting
Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)) (internal citations
omitted).  "Second, only a complaint that states a plausible claim for relief survives a

motion to dismiss." Id. (quoting Ashcroft, 129 S. Ct. at 1950).  "This second principle

recognizes that the court's assessment of the pleadings is 'context specific,' requiring 'the

reviewing court to draw on its judicial experience and common sense.'  '[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not show[n] – that the pleader is

entitled to relief.'"  Id. (quoting Ashcroft, 129 S. Ct. at 1950) (internal quotations and

citation omitted; alterations in original).

### B.    Sufficiency of AIBT's Fraud Allegations

Under the law of the Federal Circuit,

> [a] patentee who brings an infringement suit may be subject to
> antitrust liability for the anti-competitive effects of that suit if the
> alleged infringer (the antitrust plaintiff) proves (1) that the asserted
> patent was obtained through knowing and willful fraud within the
> meaning of *Walker Process Equipment, Inc. v. Food Machinery &
> Chemical Corp.*, 382 U.S. 172, 177, 86 S. Ct. at 350, 147 USPQ
> 404, 407 (1965), or (2) that the infringement suit was a mere sham to
> cover what is actually nothing more than an attempt to interfere
> directly with the business relationships of a competitor.

Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068 (Fed. Cir. 1998)

(quotations and citations omitted).[7]  In the instant case, AIBT claims that Varian is liable

for *Walker Process* fraud and "sham litigation" because it attempted by way of its

---

[7]  The issue "whether conduct in procuring or enforcing a patent is sufficient to strip a
patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit
law." Nobelpharma AB, 141 F.3d at 1068.  However, "issues involving other elements of
antitrust law such as relevant market, market power, damages, etc.," which "are not unique to
patent law," are governed by the law of the regional circuit.  Id.

infringement action to enforce a patent that was procured by fraud on the PTO.  (See Compl. ¶¶ 1, 90-93).  By its motion to dismiss, Varian contends that all of AIBT's antitrust claims must be dismissed because AIBT has failed to plead fraud with particularity.  For the reasons that follow, this court concludes that AIBT's allegations regarding the '328 Patent and the Panofsky Reference are insufficient to support a claim of fraud on the PTO, but that the plaintiff has stated a claim for fraud based on the defendants' alleged failure to disclose the White Reference, the Quad Magnet, White's offer to sell, and White's identity as an inventor.[8]

### Requirements for Pleading Fraud

"The first barrier for a *Walker Process* claimant to clear is the requirement that the

---

[8]  In arguing that all of AIBT's antitrust claims are subject to dismissal for failure to plead fraud with particularity, Varian makes no distinction between AIBT's *Walker Process* claims and its sham litigation claims.  (See Def. Mem. (Docket No. 9) at 10).  Similarly, AIBT has made no such distinction in the body of its memorandum in opposition to the motion to dismiss, arguing instead that its Complaint contains sufficient allegations to plead fraud on the PTO.  (See Pl. Opp. Mem. (Docket No. 11) at 6-15).  Contrary to its position in the earlier litigation, AIBT argues in a footnote that the standards for these claims differ, and that it is not required to establish fraud in order to prevail on its sham litigation claims.  (See id. at 7 n.3).  However, the First Circuit has "repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived." Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 61 n.17 (1st Cir. 1999), aff'd sub nom. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000).  See also Redondo-Borges v. U.S. Dep't of Housing & Urban Dev., 421 F.3d 1, 6 (1st Cir. 2005) ("Few principles are more sacrosanct in this circuit than the principle that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).  Accordingly, AIBT's passing argument is insufficient to warrant separate analyses of AIBT's fraud claims and its sham litigation claims.  In any event, it is clear from the Complaint that the factual basis for all of AIBT's claims is that Varian, by its infringement action, was attempting to enforce a patent that it knew had been obtained by fraud on the PTO.  (See Compl. ¶¶ 90-93).  Therefore, the parties' arguments relating to AIBT's fraud claims control the sham litigation claims as well.

-23-

patent be obtained through actual fraud upon the PTO."  Dippin' Dots, Inc. v. Mosey,

476 F.3d 1337, 1346 (Fed. Cir. 2007).  This requires "higher threshold showings of both

materiality and intent than are required to show inequitable conduct."  Id.  Accordingly,

> [as a]pplied to patent prosecution, fraud requires (1) a false
> representation or deliberate omission of a fact material to
> patentability, (2) made with the intent to deceive the patent
> examiner, (3) on which the examiner justifiably relied in granting the
> patent, and (4) but for which misrepresentation or deliberate
> omission the patent would not have been granted.

C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1364 (Fed. Cir. 1998).

Additionally, "[i]t is undisputed that fraud-related claims arising in a patent

context must be pled with the specificity required by Fed. R. Civ. P. 9(b)."  The Hertz

Corp. v. Enter. Rent-A-Car Co., 557 F. Supp. 2d 185, 194 (D. Mass. 2008).  This "means

that [the] complaint must specify the time, place, and content of an alleged false

representation."  U.S. ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009)

(quotations and citations omitted).  It also must identify "the basis for inferring scienter."

N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir.

2009).  Thus, "[t]he courts have uniformly held inadequate a complaint's general

averment of the defendant's 'knowledge' of material falsity, unless the complaint *also*

sets forth specific facts that make it reasonable to believe that defendant knew that a

statement was materially false or misleading."  Id. (citations omitted).  Furthermore,

where, as here, the case involves an alleged failure to disclose information to the PTO,

"*Walker Process* and FRCP 9(b) require" that the plaintiff "identify with particularity the

reference or group of references that, but for their omission from [the patentee's] patent applications, the PTO would not have granted the applications." Netflix, Inc. v. Blockbuster, Inc., No. C 06-02361 WHA, 2006 WL 2458717, at *4 (N.D. Cal. Aug. 22, 2006).

### Allegations Concerning the '328 Patent

Varian contends that AIBT's allegations regarding the '328 Patent do not allege fraud as a matter of law because the inventors disclosed and accurately described the '328 Patent to the PTO.[9]  This court agrees, and finds that the plaintiff cannot sustain a claim based on allegations that the inventors misled the PTO about the '328 Patent.

As described above, AIBT claims that the defendant inventors engaged in fraud by filing false Inventor Declarations with the PTO.  It claims that the Declarations were false and misleading because by executing them, the individual defendants attested to their status as the true inventors of the '156 Patent even though they knew that one or more of

---

[9]  In its Reply memorandum, Varian suggests that collateral estoppel, or issue preclusion, applies to AIBT's claims concerning the '328 Patent "because AIBT has not added any substantively new facts or arguments about the '328 patent beyond those already held insufficient as a matter of law to allege fraud[.]"  (Def. Reply Mem. (Docket No. 15) at 4-5).  This court disagrees.  The Complaint contains new factual allegations regarding the '328 Patent, including facts regarding the substance of two letters from Purser to Enge, as well as facts regarding the changes to the description of Figure 6 of the '328 Patent.  No such allegations were included in Varian's counterclaim in the infringement action, and this court has not previously considered whether they support AIBT's claims of fraud on the PTO.  Accordingly, application of collateral estoppel principles would not be appropriate.  See Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 51 (1st Cir. 1997) ("The principle of collateral estoppel, or issue preclusion ... bars relitigation of any factual or legal issue that was *actually* decided in previous litigation between the parties, whether on the same or a different claim.") (emphasis in original; quotations and citations omitted).

the claims contained therein was anticipated by the '328 Patent.  This court finds that any

suggestion that the defendants were attempting to mislead or otherwise deceive the PTO

by their conduct in filing the Inventor Declarations is defeated by the undisputed fact that

they disclosed the '328 Patent to the PTO, and the Patent Examiner considered the '328

Patent before allowing the claims of the '156 Patent.

      The record shows that the defendant inventors disclosed the '328 Patent in each of

the applications that they submitted to the PTO, and in disclosure statements filed with the

PTO.  (See Compl. Exs. E at 5 and G at 5; Def. Exs. 1-3).  The inventors even alerted the

PTO to the fact that the '328 Patent described a "dual rod design" similar to the alleged

configuration of the invention of the '156 Patent.  (See Def. Ex. 1 at 5).  In addition, the

record shows that on March 31, 2005, and again on March 4, 2007, the Patent Examiner

initialed references to the '328 Patent on the defendants' disclosure statements.  (Def. Exs.

2-3).  These facts compel the presumption "that the examiner did consider the reference."

Molins PLC v. Textron, Inc., 48 F.3d 1172, 1184 (Fed. Cir. 1995).  See also C.R. Bard,

Inc., 157 F.3d at 1366-67 (rejecting charge of fraud where prosecution history revealed

that patent holder disclosed prior art before issuance of patent and patent examiner

initialed that he had considered the reference).  Thus, the PTO was able to make a

determination, based on the defendant inventors' own disclosures of the prior art, as to

whether the '328 Patent anticipated the claims of the '156 Patent.  Under these

circumstances, the plaintiff has not stated a plausible claim that the defendant inventors,

by signing and filing the Inventor Declarations, were attempting to deceive the PTO

regarding the significance of the '328 Patent.  See Nobelpharma AB, 141 F.3d at 1070 (to

establish *Walker Process* fraud, "a misrepresentation or omission must evidence a clear

intent to deceive the examiner and thereby cause the PTO to grant an invalid patent").

AIBT's reliance on the October 3, 2002 and February 12, 2003 letters from Purser

to Enge does not compel a different conclusion.  "An inventor's opinions regarding a prior

art device known to the examiner are not within the domain of material that must be

submitted to the PTO."  Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365,

1378 (Fed. Cir. 2001).  Therefore, the defendants' conduct in submitting the Inventor

Declarations without divulging any earlier doubts about the patentability of their invention

did not render their statements to the PTO misleading.  See id. (district court erred by

inferring an intent to deceive PTO based on applicant's failure to provide PTO with

inventor opinions about prior art device).[10]

Nor do AIBT's allegations regarding the inventors' removal of the phrase "for at

least one embodiment" from their description of Figure 6 of the '328 Patent support a

plausible claim of fraud on the PTO.  To the extent AIBT claims that the defendants chose

---

[10]  The Inventor Declarations submitted to the PTO in this case are not comparable to
declarations submitted to the PTO in eSpeed, Inc. v. Brokertec USA, L.L.C., 480 F.3d 1129
(Fed. Cir. 2007), on which AIBT relies.  There the court upheld the district court's conclusion
that there was an intent to deceive the PTO where the applicant had filed a "blizzard of paper"
describing the prior art, along with a declaration containing "an outright false statement"
regarding that art.  eSpeed, Inc., 480 F.3d at 1137-38.  Here, the plaintiff alleges that the
Declarations were false only because they were inconsistent with an opinion that had been
expressed by an inventor, which opinion was not required to be disclosed to the PTO.  Moreover,
as detailed above, the facts provided to the PTO regarding the '328 Patent were not "outright
false."

to describe a less relevant embodiment, while remaining silent about other, more relevant

embodiments, "[AIBT] has provided no support for the proposition that a patent holder

who discloses a reference to the PTO can be found liable for *Walker Process* fraud solely

based on an alleged failure to bring every detail of the disclosed reference to the

examiner's attention." <u>Chip-Mender, Inc. v. Sherwin-Williams Co.</u>, No. C 05-3465 PJH,

2006 WL 13058, at *7 (N.D. Cal. Jan. 3, 2006).  Moreover, to the extent AIBT contends

that the defendants' removal of language from the '085 Continuation Patent Application

constituted an affirmative effort to deceive the Patent Examiner regarding the scope of the

invention, this too is insufficient to support a claim of fraud on the PTO in this case.  The

inventors' original description of Figure 6 was before the PTO as part of the '322

Provisional Application, and nothing about the inventors' altered description of Figure 6 in

their '085 Continuation Patent Application suggests that the '328 Patent describes only

one embodiment.  (<u>See</u> Compl. Exs. E at 5; G at 5).  Moreover, as detailed above, it is

undisputed that the entire Patent was before the PTO, and that the Patent Examiner

considered it.  Thus, the Patent Examiner would have seen that the '328 Patent describes

more than one embodiment, including the alleged "more relevant embodiment" depicted in

Figures 4 and 5, which appear on the same page of the Patent as Figure 6.  (<u>See</u> Compl.

Ex. F; Compl. ¶ 46).

     The facts alleged in this case are not analogous to the circumstances described in

<u>Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.</u>, 204 F.3d 1368 (Fed. Cir. 2000),

on which AIBT relies.  In <u>Semiconductor Energy Lab.</u>, the applicant submitted a 29-page

reference in its original Japanese, "along with a one-page, partial translation focusing on less material portions and a concise statement directed to these less material portions[.]" Id. at 1377. Based on this conduct, the court determined that the applicant had "left the examiner with the impression that the examiner did not need to conduct any further translation or investigation", and it concluded that the applicant had "deliberately deceived the examiner" and "constructively withheld the reference from the PTO." Id. The court also rejected the applicant's contention that the patent examiner must have read and understood the untranslated reference, stating

> [t]hough the examiner is indeed presumed to have done his job correctly, there is no support in the law for a presumption that the examiner will understand foreign languages such as Japanese or will request a costly complete translation of every submitted foreign language document, particularly in the absence of any reason to do so. Rather, as MPEP § 609C(2) reveals, the examiner's understanding of a foreign reference is generally limited to that which he or she can glean from the applicant's concise statement ....

Id. No similar situation would have restricted the Patent Examiner's ability to review the entire '328 Patent in this case, and there are no alleged facts to defeat the presumption that the Patent Examiner did just that.

The plaintiff points to other cases in which the courts have found fraud based on the misleading disclosures of English language references. However, the applicants' deceptive conduct in those cases consisted of burying the most pertinent prior art among large volumes of less relevant prior art. See eSpeed, Inc. v. BrokerTec USA, L.L.C., 480 F.3d 1129, 1137 (Fed. Cir. 2007) ("blizzard of paper" submitted to PTO in conjunction

with declaration containing outright false statement regarding significance of prior art "left the examiner with the impression that the examiner did not need to conduct any further ... investigation") (quotations and citation omitted; punctuation in original); <u>Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.</u>, 837 F. Supp. 1444, 1477 (N.D. Ind. 1992) (holding that it is "a violation of the duty of candor and fair dealing with the [PTO] for an applicant ... to disclose a pertinent prior art patent reference to the examiner in such a way as to 'bury' it or its disclosures in a series of disclosures of less relevant prior art references, so that the examiner would be likely to ignore the entire list and permit the application to issue"), <u>aff'd</u>, 11 F.3d 1072 (Fed. Cir. 1993); <u>Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.</u>, 359 F. Supp. 948, 964-65 (S.D. Fla. 1972) (failure to cite most pertinent prior art, and attempt "to bury" relevant patent "in a long list of allegedly old prior art patents in the hope that the Patent Examiner ... would ignore the list and permit the [applicant's] patent to issue" constituted deliberate misrepresentations to the patent office), <u>aff'd</u>, 479 F.2d 1328 (5th Cir. 1973). No such comparable conduct has been alleged here with respect to the '328 Patent.  Accordingly, this court concludes that AIBT's allegations regarding the '328 Patent do not state a claim for fraud.

## <u>Allegations Regarding Other Prior Art References</u>

Varian argues that this court should dismiss AIBT's fraud claims to the extent that they rely on allegations concerning the White and Panofsky References, the Quad Magnet, White's offer to sell and the failure to disclose White as an inventor.  Specifically, it contends that the court has already considered these allegations in connection with the

motion to dismiss AIBT's counterclaims in the infringement action, and found them insufficient to support a claim for fraud.  (Def. Mem. at 14-15).  Furthermore, Varian asserts that in any event, AIBT has failed to allege facts showing that the defendants "misrepresented or omitted material facts concerning these items with the specific intent to deceive the PTO."  (Id. at 15).  AIBT's Complaint, including its allegations relating to the various prior art references, is more detailed than its counterclaims in the infringement action.  Moreover, in contrast to its memorandum in opposition to the motion to dismiss its counterclaims in the prior action, in the instant case AIBT has specifically addressed all of the prior art references, and not simply the '328 Patent, in its brief in opposition to the present motion to dismiss.  Thus, the issue as to the sufficiency of the allegations regarding these other prior art references is squarely before the court for the first time here, and this court finds that it is appropriate to address it.  For the reasons detailed below, this court concludes that the plaintiff's allegations regarding the Panofsky Reference fail to support a claim of fraud on the PTO, but its allegations regarding the remaining references are adequate to survive Varian's motion to dismiss.

The Panofsky Reference is attached as Exhibit I to the Complaint.  It consists of an article entitled "Magnetic Quadrupole with Rectangular Aperture," which was written by L.N. Hand and W.K.H. Panofsky, and was published in the October 1959 issue of The Review of Scientific Instruments at Volume 30, Number 10.  (Compl. Ex. I).  Notwith-standing the plaintiff's allegations to the contrary, the record establishes that the defendant inventors included the Panofsky Reference on their list of prior art references disclosed to

the PTO, and that the Patent Examiner considered it in connection with the application for

the '156 Patent.  (Def. Exs. 2-3).  For the reasons detailed previously with respect to the

'328 Patent, these facts belie the plaintiff's claim that the defendant inventors intended to

mislead the PTO and defeat the plaintiff's effort to allege fraud on the PTO.

      With respect to the White Reference, it is undisputed that the defendant inventors

discussed it briefly in the background to the invention section of the '156 Patent. (See

Compl. ¶ 52; Compl. Ex. A at Col. 2, ll. 24-31).  While this might suggest that the

defendants did not intend to withhold the Reference from the PTO, AIBT claims that the

inventors were obligated to disclose the full publication to the PTO, and that their failure

to do so constituted fraud.  (See Compl. ¶ 64).  Varian argues that AIBT's claims must be

dismissed because it has failed to allege facts manifesting an intent to deceive the PTO.

(Def. Mem. at 9; Def. Reply Mem. at 7).  However, this court finds that the plaintiff's

allegations are sufficient to support an inference that the defendants acted with the

requisite intent.

      AIBT claims that the full White Reference was material to the patentability of the

'156 Patent because it disclosed a dual bar system with independently powered and

controllable coils.  (See Compl. ¶¶ 51, 54, 63).  The fact that the inventors discussed the

Reference in the '156 Patent specification indicates that they were aware of its contents,

and consequently, its relevance.  However, nothing in their discussion addressed the dual

bar structure allegedly disclosed by the White Reference.  (See Compl. Ex. A at Col. 2, ll.

24-31).  Furthermore, as alleged in the Complaint, "[t]he Defendant inventors intentionally

-32-

failed to disclose this reference to the PTO as required by 37 C.F.R. § 1.56(a) . . . in any

Information Disclosure Statement PTO form 1449 . . . ."  (Compl. ¶ 55).  Thus, although it

is undisputed that the defendant inventors disclosed the existence of the White Reference

in their patent specification, this court concludes that the allegations of their failure to

include it on their disclosure statements or to otherwise bring pertinent parts of the

Reference to the Patent Examiner's attention, despite their knowledge of its significance,

are sufficient to state a claim that the defendants intended to mislead the PTO.  See

Golden Valley Microwave Foods, Inc., 837 F. Supp. at 1477 ("prior art has to be brought

to the attention of the examiner in an adequate fashion") (quotations and citations

omitted).

      This court also concludes that the plaintiff's allegations regarding the defendant

inventors' failure to disclose the Quad Magnet and White's offer to sell the White 2 Bar

Lens are sufficient to state a claim for fraud on the PTO.  In both cases, AIBT has alleged

facts indicating that the undisclosed information concerned technology containing features

which anticipated the '156 Patent or would have rendered it obvious.  (See Compl. ¶¶ 65,

67, 72, 74, 81, 85).  It has also alleged facts showing that the defendant inventors knew of

those features, and consequently, knew that the Quad Magnet and the offer to sell the

White 2 Bar Lens were relevant to the patentability of the '156 Patent.  (See id. ¶¶ 65-66,

69, 74-79).  AIBT claims that nevertheless, the defendant inventors intentionally failed to

cite the Quad Magnet and White's offer for sale "to the PTO as required by 37 C.F.R.

§ 1.56(a) [R-2] in any Information Disclosure Statement PTO form 1449, . . . and did so

with the intent to deceive."  (Id. ¶¶ 69, 82).  It also claims that the PTO would not have

allowed the '156 Patent "with coverage that included the dual bar system as described in

the 156 Patent" if the inventors had made the requisite disclosures.  (Id. ¶¶ 73, 86).  These

allegations go "beyond a simple failure to disclose to the Patent Office prior art that the

examiner would have deemed material."  Hydril Co. LP v. Grant Prideco LP, 474 F.3d

1344, 1349 (Fed. Cir. 2007).  As the Federal Circuit determined when presented with

similar claims in Hydril Co., such allegations are adequate to support a claim for *Walker*

*Process* fraud.  See id. (allegations that defendant had fraudulently obtained issuance of its

patent "by failing to disclose to the USPTO material prior art of which it was aware

(which the complaint described) and that the . . . Patent as issued would not have been

granted to [defendant] had [defendant] not omitted from its disclosures such known

information on the prior art" stated claim for violation of antitrust law) (internal quotations

and punctuation omitted).

   Varian argues that Hydril is not controlling here because the Federal Circuit was

not faced with a direct challenge to the suffficiency of the allegations of fraud, but, rather,

had to determine whether the Hydril complaint alleged the minimal level of enforcement

activity by the patent holder against the plaintiff to state a claim for *Walker Process* fraud.

(Def. Reply Mem. at 6).  Therefore, Varian contends, the Federal Circuit's analysis of the

factual allegations of fraud and its conclusion that "the conduct alleged in Hydril's

complaint could constitute *Walker Process* fraud is 'nothing more than dicta.'"  Id.; see

Hydril, 474 F.3d at 1349.  This argument is without merit.  Regardless whether the Hydril

-34-

court's analysis of the fraud allegations before it is binding as precedent, its conclusion that the plaintiff had stated a claim for *Walker Process* fraud based on similar allegations as those alleged here is persuasive.  This court finds that at this initial stage in the litigation, AIBT has pled enough to pursue its claims for fraud based on the alleged failure to disclose the Quad Magnet and White's offer to sell.

Varian also contends that Hydril is "legally irrelevant" because it was decided before the Supreme Court issued its decision in Bell Atl. Corp., which toughened the requirements for stating a cause of action under Fed. R. Civ. P. 8(a) by requiring plaintiffs to allege "a plausible entitlement to relief."  (Def. Reply Mem. at 6-7).   Again, Varian's argument is unpersuasive.  As an initial matter, the fraud allegations in Hydril would have been subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  Moreover, Varian has not shown that AIBT's allegations fail to state "a plausible entitlement to relief."  Bell Atl. Corp., 550 U.S. 559, 127 S. Ct. at 1967.   As described above, AIBT has alleged facts, not merely conclusions, to show why the defendant inventors would have understood the relevance of the Quad Magnet and White's offer to sell to the patentability of their invention.  It has also alleged facts showing that despite their disclosure obligations, the defendant inventors failed to include this information in their list of references submitted to the PTO.  Those facts make it possible for a reasonable fact finder to conclude that the defendants were attempting to hide pertinent information from the PTO.   Thus, they support a claim for relief under the applicable pleading standards.

Finally, this court concludes that AIBT has stated a claim based on the defendant inventors' failure to name White as an inventor of at least one claim limitation of the '156 Patent. In its Complaint, the plaintiff alleges that the White 2 Bar Lens consisted of a "structure manufactured from only two magnetic cores" and "described an invention described in the 156 Patent[.]" (Compl. ¶¶ 81, 85). Allegedly, defendant Purser became aware of these features when White disclosed his invention in a PowerPoint presentation that was delivered to Varian in March 2003. (Id. ¶¶ 76-77). However, the defendant inventors "knowingly and intentionally failed to name Nicholas White as a co-inventor of at least one claim limitation of the 156 Patent," thereby rendering it unenforceable. (Id. ¶ 89). This court finds that the defendants' alleged failure to name White as a co-inventor despite their knowledge of his contribution to the claims of the '156 Patent is sufficient to state a claim that the defendants were attempting to deceive the PTO.

### C.   Sufficiency of Allegations of Antitrust Injury

Varian has also moved to dismiss all of AIBT's antitrust claims for failure to allege antitrust harm. As detailed below, this court finds that in its new Complaint AIBT has sufficiently alleged that Varian's infringement action harmed the competitive process by delaying AIBT's entry into the ion implantation equipment market. Therefore, this court recommends that Varian's motion to dismiss for failure to allege antitrust injury be denied.

"A private antitrust plaintiff, in addition to having to show injury-in-fact and proximate cause, must allege, and eventually prove, 'antitrust injury.'" In re Cardizem CD Antitrust Litig., 332 F.3d 896, 909 (6th Cir. 2003) (quoting Brunswick Corp. v. Pueblo

Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 697, 50 L. Ed. 2d 701 (1977)).

"Antitrust injury" is "injury of the type the antitrust laws were intended to prevent and that

flows from that which makes defendants' acts unlawful.  The injury should reflect the

anticompetitive effect either of the violation or of anticompetitive acts made possible by

the violation.  It should, in short, be 'the type of loss that the claimed violations . . . would

be likely to cause.'"  Brunswick Corp., 429 U.S. at 489, 97 S. Ct. at 697-98 (quoting

Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125, 89 S. Ct. 1562, 1577, 23 L.

Ed. 2d 129 (1969)).  As the First Circuit has explained,

> a practice is not "anticompetitive" simply because it harms competi-
> tors.  After all, almost all business activity, desirable and undesirable
> alike, seeks to advance a firm's fortunes at the expense of its compe-
> titor's.  Rather, a practice is "anticompetitive" only if it harms the
> competitive process.  It harms that process when it obstructs the
> achievement of competition's basic goals – lower prices, better
> products, and more efficient production methods.

Town of Concord, Mass. v. Boston Edison Co., 915 F.2d 17, 21-22 (1st Cir. 1990)

(internal citations omitted).

AIBT argues that "Defendants' objectively baseless infringement lawsuit, seeking

to enforce a patent that they knew was fraudulently obtained and invalid, harmed

competition by delaying AIBT's entry into the relevant market."  (Pl. Opp. Mem. at 15).

It is undisputed that "one may violate the antitrust laws by bringing baseless litigation

intended to delay entry into the market by a competitor."  In re Richard Roe, Inc., 168

F.3d 69, 72 (2d Cir. 1999).  Nevertheless, Varian asserts that AIBT's claims must be

dismissed because its Complaint fails to allege facts showing that any delay actually

resulted in harm to the competitive process. (Docket No. 24 at 1). This court disagrees, and finds that AIBT has sufficiently alleged that the delay caused by Varian's infringement action had an anticompetitive impact on the market.

In its Complaint, AIBT has greatly expanded its allegations of harm. Specifically, AIBT alleges that as a result of the infringement suit, AIBT's sole customer, TSMC, required AIBT to conduct an in-depth analysis of its iPulsar product to assure it that there were no infringement issues. (Compl. ¶ 104). This allegedly caused delay in the qualification process and in TSMC's ultimate acceptance of AIBT's product. (Id.). AIBT also alleges that TSMC's acceptance process was further delayed by the fact that AIBT had to divert personnel away from their work integrating the iPulsar product into the client's system in order to respond to the infringement action. (Id.). According to AIBT, the iPulsar is superior to Varian's products, and enables manufacturers "to produce consumer electronics in a more efficient and cost effective manner." (Id. ¶ 106). Thus, by its infringement action, Varian allegedly was able to postpone its competitor's ability to compete in the ion implantation device market and to introduce a superior product to that market. In addition, Varian allegedly was able to "raise and maintain prices above competitive levels." (Id. ¶ 103). This is the type of injury that the antitrust laws were intended to prevent. See In re Cardizem CD Antitrust Litig., 332 F.3d at 910 (agreement that "effectively eliminated generic [drug] competition in the market for Cardizem CD from July 1998 through July 1999" constituted "'type of injury' the antitrust laws were meant to prevent"); Abbott Labs. v. Teva Pharms. USA, Inc., 432 F. Supp. 2d 408, 431

(D. Del. 2006) (allegations that market entry was delayed as a result of infringement litigation reflected "injury to competition" and alleged antitrust harm).   Accordingly, AIBT has adequately alleged antitrust injury.[11]

Varian argues that "AIBT's new allegations of antitrust harm improperly include purported concerns expressed by AIBT's customers *after* Varian granted AIBT a covenant not to sue on November 25, 2008," and that "[a]s the Court previously found, post-November 25, 2008 events such as these are irrelevant to an antitrust harm analysis." (Def. Mem. at 17).   Varian's argument does not alter this court's conclusion that AIBT has stated a claim for antitrust injury.   As an initial matter, this court did not determine that post-November 25, 2008 events are irrelevant to the issue of antitrust harm.   Rather, in its 2009 R&R, this court merely concluded that litigation expenses incurred by AIBT in connection with the prosecution of its own antitrust claims in the infringement action could not constitute harm resulting from having to defend against Varian's allegedly

---

[11] AIBT's allegations regarding its potential customer, PSC, do not on their own allege antitrust injury.  Although AIBT alleges that the infringement action caused a delay in the implementation of a demonstration plan that the plaintiff had planned for PSC, it does not allege that the delay resulted in harm to the competitive process.  In particular, but without limitation, AIBT has not alleged facts showing that PSC ultimately accepted AIBT's product.  Therefore, it has not shown that the infringement action, rather than AIBT's own inability to consummate a deal with PSC, impeded the plaintiff's ability to compete in the marketplace and deprived manufacturers of a superior product.  Similarly, to the extent AIBT alleges other types of harm, such as increased costs or harm to its good will, it will need to show how any such harm obstructed the competitive process.  It will also need to show that any damages it suffered occurred a result of Varian's conduct in pursuing baseless infringement claims and not as a result of its own decision to extend the infringement action by pursuing its antitrust counterclaims.  In any event, because this court concludes that AIBT has alleged antitrust harm based on its allegations regarding its sale to TSMC, the precise contours of AIBT's antitrust injury do not need to be defined at this time.

baseless infringement claims.  (See 2009 R&R at 12).  Furthermore, AIBT's allegations

that TSMC expressed concern about the infringement action even after Varian granted

AIBT a covenant not to sue, and did not begin to accept the plaintiff's iPulsar products

until after Varian's claims in that action had been dismissed, (see Compl. ¶¶ 104, 106),

support the plaintiff's claim that its entry into the market was delayed as a result of

Varian's lawsuit.  Therefore, Varian has not established that AIBT's claims should be

dismissed for failure to allege antitrust harm.

### D.    Insufficiency of Conspiracy Allegations

In the infringement action, this court found that AIBT had failed to state a claim for

conspiracy to monopolize because it had not alleged "any facts, as opposed to conclusory

statements, indicating that the inventors and Varian entered into any agreement with the

specific intent to monopolize the market."  (2009 R&R at 21-22).  Because AIBT has

failed to cure this deficiency in its present Complaint, this court recommends that its

conspiracy claim be dismissed with prejudice.

As it did in the infringement action, AIBT relies on allegations that the defendants

filed a baseless patent infringement action as evidence of a conspiracy to monopolize.  In

particular, the plaintiff alleges in relevant part that

> Defendants agreed to engage in improper exclusionary conduct with
> the intent to monopolize the ion implantation equipment market.  In
> particular, despite Defendants' knowledge that the 156 Patent was
> procured through fraud and is invalid, the Defendants agreed to file
> and then filed the baseless patent infringement action against AIBT in
> Civil Action No. 08-10487-NG asserting the invalid 156 Patent with

the intent to create and/or maintain a monopoly in the ion
implantation market.

(Compl. ¶ 137).  AIBT argues that these facts, when taken as true, demonstrate "a
conscious commitment to the common scheme of thwarting competition through the
institution of baseless infringement litigation."  (Pl. Opp. Mem. at 19).  Once again, AIBT
has provided no support for its position that the defendants' agreement to bring a lawsuit,
without more, constitutes evidence of a conspiracy.

        To withstand a motion to dismiss a claim for conspiracy to monopolize, the
plaintiff must allege facts showing a "specific intent to monopolize."  Boston Scientific
Corp. v. Schneider (Europe) AG, 983 F. Supp. 245, 268 (D. Mass. 1997).  See also
Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc., 405 F. Supp. 2d 1141,
1152-53 (C.D. Cal. 2005) (dismissing claim for conspiracy to monopolize where plaintiffs
failed "to allege a specific intent by Defendants to empower one of them with monopoly
power").  However, under AIBT's theory, there would be no need for a specific agreement
to monopolize.  Rather, any time two or more parties initiated an allegedly baseless
infringement lawsuit against a competitor, that conduct standing alone would establish a
specific intent to monopolize.  As this court previously concluded in its 2009 R&R, "this
is inconsistent with the applicable law."  (2009 R&R at 22).

        AIBT does allege that Varian entered into the technology license with the inventors
and acquired the 156 Patent "in an effort to obtain blocking intellectual property rights in
order to increase its dominant market share and stifle competition."  (Compl. ¶ 90).  To the

extent AIBT relies on these allegations to support its claim for conspiracy, they are merely

conclusory and are insufficient to state a claim.  See Ashcroft, 129 S. Ct. at 1950

(pleadings that "are no more than conclusions, are not entitled to the assumption of

truth").  There is nothing inherently suspect about a license agreement and AIBT has not

provided any factual basis to support its contention of a sinister motive.  Similarly, AIBT's

allegations that "Defendants have conspired with one another in a deliberate effort to

further Varian's monopoly power in the relevant market, exclude AIBT from the relevant

market, and stifle competition" are equally inadequate to plead the necessary intent.

"While legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations."  Id.  Because AIBT has not alleged any facts which

would support even the inference of a specific intent to monopolize, it has not stated a

"plausible claim for relief[.]"  Id.

## IV.  CONCLUSION

For all the reasons detailed herein, this court finds that AIBT's allegations that the

defendants misled the PTO concerning the '328 Patent and the Panofsky Reference fail to

support its claim for fraud on the PTO, and should be dismissed with prejudice, as should

AIBT's renewed claim of conspiracy to monopolize, which also fails to state a claim.

However, this court finds that AIBT has otherwise stated a claim for violation of the

antitrust laws based on the defendants' alleged failure to disclose to the PTO the White

Reference, the Ionex Quad Magnet, White's offer to sell Varian certain technology, and

White's identity as allegedly one of the inventors of the '156 Patent.  This court recom-

mends to the District Judge to whom this case is assigned that the "Defendants' Motion to Dismiss Plaintiff's Complaint" (Docket No. 8) be ALLOWED IN PART and DENIED IN PART accordingly.[12]


　　　　　　　　　　　　　　　　　　／ s／ Judith Gail Dein
　　　　　　　　　　　　　　　　　　Judith Gail Dein
　　　　　　　　　　　　　　　　　　United States Magistrate Judge

---

[12] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).